## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ODETTE BLANCO DE FERNANDEZ** *née* **BLANCO ROSELL; EMMA RUTH BLANCO, in her personal capacity, and as Personal Representative of the ESTATE OF ALFREDO BLANCO ROSELL, JR; HEBE BLANCO MIYARES, in her personal capacity, and as Personal Representative of the ESTATE OF BYRON BLANCO ROSELL; SERGIO BLANCO DE LA TORRE, in his personal capacity, and as Administrator** *Ad Litem* **of the ESTATE OF ENRIQUE BLANCO ROSELL; EDUARDO BLANCO DE LA TORRE, as Administrator** *Ad Litem* **of the ESTATE OF FLORENTINO BLANCO ROSELL; LIANA MARIA BLANCO; SUSANNAH VALENTINA BLANCO; LYDIA BLANCO BONAFONTE; JACQUELINE M. DELGADO; BYRON DIAZ BLANCO, JR.; MAGDELENA BLANCO MONTOTO; FLORENTINO BLANCO DE LA TORRE; JOSEPH E. BUSHMAN; CARLOS BLANCO DE LA TORRE; and GUILLERMO BLANCO DE LA TORRE** | **CIVIL ACTION NO:**<br><br>**SECTION:**<br><br>**DISTRICT JUDGE:**<br><br>**MAGISTRATE JUDGE:** |
| **VERSUS** | |
| **A.P. MOLLER-MAERSK A/S (a/k/a A.P. MOLLER-MAERSK GROUP); MAERSK A/S (a/k/a MAERSK LINE A/S); MAERSK, INC.; and MAERSK AGENCY U.S.A., INC** | |

## **COMPLAINT**

Odette Blanco de Fernandez *née* Blanco Rosell ("Odette Blanco Rosell"); Emma Ruth

Blanco, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco

Rosell, Jr; Hebe Blanco Miyares, in her personal capacity, and as Personal Representative of the

Estate of Byron Blanco Rosell; Sergio Blanco, in his personal capacity, and as Administrator *Ad*

*Litem* of the Estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as Administrator *Ad*

*Litem* of the Estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Diaz Blanco, Jr.; Magdelena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre ("Plaintiffs"), by and through counsel, as and for their Complaint against A.P. Moller-Maersk A/S (a/k/a A.P. Moller-Maersk Group) ("Maersk"); Maersk A/S (a/k/a Maersk Line A/S) ("Maersk A/S"); Maersk, Inc. ("Maersk Inc."); and Maersk Agency U.S.A., Inc. ("Maersk Agency") (collectively, "Defendants") hereby allege:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, et seq. (the "Helms-Burton Act" or "Act") against Defendants for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959 and as to which Plaintiffs own claims.

2.      On September 29, 1960, the Cuban Government published the announcement of the confiscation without compensation of the following property of Plaintiff Odette Blanco Rosell and her siblings, all of whom are deceased:  Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell (collectively, the "Blanco Rosell Siblings")[1]:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.
>
> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

---

[1] As stated above, the Estates of Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell, respectively are Plaintiffs.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23405 - 23406 (English translation).

3.      The "persons listed in the first Whereas" in Resolution No. 436 above is a reference to the Blanco Rosell Siblings, who had been the subject of "investigations" carried out by the Cuban Government.  *See id.* at 23405 (first Whereas clause) ("Whereas: Having considered cases number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried out on the following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

4.      The Blanco Rosell Siblings' property confiscated by the Cuban Government included all of their "property and rights, whatever their nature," including but not limited to:

(a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and

(b) their wholly owned companies, Central San Ramón and Compañia Azucarera Mariel S.A., including those companies' extensive land holdings (approximately 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation) ("Confiscated Property").

5.      The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.  Today, only Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 91, is alive.

6.      In 1996, the U.S. Congress passed the Helms-Burton Act, and President Bill Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban Government on or after January 1, 1959, the claims to which are owned by persons who became U.S. nationals after the confiscation of their property and before March 12, 1996.

7.      Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by several Presidents (pursuant to authority granted in the Act) [mainly in six-month increments] until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed.

## PARTIES

8.      Plaintiffs incorporate by reference Paragraphs 1 through 7 as if fully set forth herein.

### I.      Plaintiffs

9.      Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She owned her claim to the Confiscated Property on March 12, 1996, which claim she still owns.  She became a naturalized U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

10.      Plaintiff Estate of Alfredo Blanco Rosell, deceased, is represented through its Personal Representative, Emma Ruth Blanco.  Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on August

26, 1970.  He owned his claim to the Confiscated Property on March 12, 1996  Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

11.     Plaintiff Estate of Byron Blanco Rosell, deceased, is represented through its Personal Representative, Hebe Blanco Miyares.  Byron Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1972.  He owned his claim to the Confiscated Property on March 12, 1996.   Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

12.     Plaintiff Estate of Enrique Blanco Rosell, deceased, is represented through its Administrator *Ad Litem* Sergio Blanco.  Enrique Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23, 1970.  He owned his claim to the Confiscated Property on March 12, 1996.  Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto Rico.

13.     Plaintiff Estate of Florentino Blanco Rosell, deceased, is represented through its Administrator *Ad Litem* Eduardo Blanco de la Torre.  Florentino Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around 1975.  He owned his claim to the Confiscated Property on March 12, 1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich, Puerto Rico.

14.     Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on January 4, 1973.  She resides in Miami-Dade County, Florida.

15.     Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco

Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996. She resides in Miami-Dade County, Florida.

16.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Alfredo Blanco Rosell's granddaughter. To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996. She resides in Miami-Dade County, Florida.

17.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on September 23, 1970. She resides in Miami-Dade County, Florida.

18.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on November 17, 1971. She resides in Miami-Dade County, Florida.

19.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A). She is Byron Blanco Rosell's daughter. To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She became a naturalized U.S. citizen on February 18, 1970. She resides in Miami-Dade County, Florida.

20.      Plaintiff Byron Diaz Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Byron Blanco Rosell's son.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, Byron Diaz Blanco, Jr. inherited and owns a portion of that claim.  He became a naturalized U.S. citizen before March 12, 1996.  He resides in Orange County, California.

21.      Plaintiff Magdelena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Florentino Blanco Rosell's daughter.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on June 21, 1977.   She resides in Coral Gables, Florida.

22.      Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim.  In addition, to the extent Enrique Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns all of that claim.  He became a naturalized U.S. citizen on January 25, 1983.  He resides in Guaynabo, Puerto Rico.

23.      Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Florentino Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen before March 12, 1996.  He resides in Gauynabo, Puerto Rico.

24.      Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is the surviving husband of Florentino Blanco Rosell's daughter, Maria

Elena Blanco.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Joseph E. Bushman inherited and owns a portion of that claim.  He was born a U.S. citizen prior to March 14, 1947 and has remained a U.S. citizen his entire life.  He resides in Sumter County, Florida.

25.     Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Carlos Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 26, 1985.  He resides in Gauynabo, Puerto Rico.

26.     Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Guillermo Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on August 3, 1982.  He resides in San Juan, Puerto Rico.

## I.     Defendants

27.     Defendant A.P. Moller-Maersk A/S ("Maersk") is a corporation organized under the laws of Denmark, with its principal place of business at Esplanaden 50, DK 1263 Copenhagen K, Denmark.  For more than 100 years, Maersk and its agents, including its consolidated subsidiaries, have enabled their customers to transport goods anywhere in the world by providing transportation and logistics.  Maersk offers customers end-to-end services and creates supply-chain efficiencies by handling warehousing, transportation, importation, and delivery of goods.  Maersk is the largest container ship and supply vessel operator in the world.  Maersk, in its own name and/or under the trade name Maersk Line, regularly purchases unregulated rail freight and other

transportation services to transport intermodal shipments between ports, docks, terminals, and gateways throughout the United States, in Louisiana and at least 23 other States including, Alabama, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia.[2]  Maersk regularly brings lawsuits in the United States, including approximately 50 lawsuits in federal district courts since 2004.

28.     Defendant Maersk A/S is a business entity organized and existing under the laws of Denmark with a principal place of business located at Esplanaden 50, DK 1098 Copenhagen K, Denmark.  Maersk A/S specializes in global container shipping and related services including the transportation of freight on inland waterways, including the intracoastal waterways on the North American Atlantic and Gulf Coasts.  Maersk A/S is registered to do business in California, New York, Pennsylvania, South Carolina, Texas, and Florida. It regularly brings lawsuits in the United States, including more than twenty lawsuits in federal district courts since 2016.  Maersk A/S is a subsidiary of Defendant Maersk.

29.     Defendant Maersk Inc. is a business entity organized and existing under the laws of New York, with a principal place of business located at 180 Park Avenue, Ste. 105, Florham Park, New Jersey 07932.  A subsidiary of Defendant Maersk, Defendant Maersk Inc., is the main American unit of Maersk, and serves as agent for Maersk and other Maersk entities including, upon information and belief, serving as agent for Defendant Maersk A/S, handling inland service, including purchasing transportation services to transport intermodal shipments between ports,

---

[2] *See Complaint ¶ 23, AP Moller-Maersk A/S, Maersk Inc., and Maersk Line UK Limited, v. BNSF Railway Company, et al*., Case No. 1:19-cv-21745-RMB (D. N.J.) (Dec. 20, 2019).

docks, terminals, and gateways throughout the United States, including in Louisiana, and at least 24 other States including, Alabama, California, Colorado, Florida, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, and Washington.[3]

30.     Defendant Maersk Agency is a business entity organized and existing under the laws of Delaware with a principal place of business located at 180 Park Avenue, Florham Park, New Jersey 07932.  Maersk Agency is primarily engaged in furnishing shipping information and acting as the agent for other Maersk entities, including, upon information and belief, serving as agent for Defendants Maersk, Maersk A/S, and Maersk, Inc. in arranging transportation for freight and cargo, including making use of the services of other transportation establishments as instrumentalities in effecting delivery.  Maersk Agency is a subsidiary of Defendant Maersk and is registered to do business in Louisiana, with a business office located at 5615 Corporate Blvd., Suite 400B, Baton Rouge, Louisiana 70808.

31.     As discussed more fully below, Defendant Maersk's website touts that, since 2016, Maersk has been providing direct shipping services from Europe and Asia to Cuba, and specifically to the Port of Mariel, Cuba:

> **In 2016, Maersk's operation in Cuba broke all records, seeing its vessels carry 23,094 FFE to the ports in Mariel and Santiago.** Volumes came from Asia primarily but also, increasingly, from Europe via a direct service which was launched the same year.

*See infra* ¶ 107.  (Emphasis added.)

---

[3] *See Complaint* ¶ 24, *AP Moller-Maersk A/S, Mærsk Inc., and Maersk Line UK Limited, v. BNSF Railway Company, et al.*, Case No. 1:19-cv-21745-RMB (D. N.J.) (Dec. 20, 2019).

32.     Defendant Maersk, together with its subsidiaries and agents, also has provided direct service from the Port of New Orleans to the Port of Mariel.  As discussed more fully below, *infra ¶¶* 108 - 110, according to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, the ship A/S PETRA (IMO # 9283708), while operated by Defendant Maersk A/S, sailed from the Port of New Orleans on four occasions in 2020 and called at the Port of Mariel, Cuba on January 20, 2020, January 31, 2020, May 20, 2020, and August 12, 2020, respectively.  At each of the aforementioned callings at the Port of Mariel, the A/S PETRA engaged in commercial activities with the Port of Mariel and the Zona Especial de Desarollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone).

33.     Upon information and belief, related to the A/S PETRA's aforementioned trafficking voyages from the Port of New Orleans to the Port of Mariel, Defendant Maersk Inc., provided, *inter alia*, inland service, and other logistical support, including purchasing transportation services related to those voyages.

34.     Upon information and belief, related to the A/S PETRA's aforementioned trafficking voyages from the Port of New Orleans to the Port of Mariel, Defendant Maersk Agency provided, *inter alia*, inland service, and other logistical support, including purchasing transportation services related to those voyages.

35.     The A/S PETRA was knowingly and intentionally directed by Defendants to the Port of Mariel, where the A/S PETRA for itself and on behalf of and/or at the direction of Defendants, engaged in commercial activities using or otherwise benefiting from the Confiscated Property, the claims to which are owned by Plaintiffs and without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).  *Infra ¶* 109.

11

36.     In addition, while at the Port of Mariel, the A/S PETRA engaged in commercial activities at least four times in 2020, whereby each of the Defendants for themselves and/or the other Defendants, caused, directed, participated in, or profited from trafficking in the Confiscated Property by another person, or otherwise engaged in trafficking in the Confiscated Property through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).  *Infra ¶* 110.

37.     According to IMO, the container ships the ALGOL (IMO # 9339612), ARTEMIS (IMO # 9339595), GALANI (IMO # 9337597), GEESKE (IMO # 9301562), and MACAO STRAIT (IMO # 9362724), while being operated by Defendant Maersk A/S from non-U.S. ports, were knowingly and intentionally directed by Defendants Maersk A/S and Maersk to the Port of Mariel, for themselves and on behalf of and/or at the direction of Defendants Maersk A/S and Maersk, engaged in commercial activities using or otherwise benefiting from the Confiscated Property, the claims to which are owned by Plaintiffs and without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).  *Infra ¶* 111 - 112.

38.     In addition, while at the Port of Mariel, the ALGOL, ARTEMIS, GALANI, GEESKE, and MACAO STRAIT engaged in commercial activities, whereby each of Defendants Maersk A/S and Maersk for themselves, caused, directed, participated in, or profited from trafficking in the Confiscated Property by another person, or otherwise engaged in trafficking in the Confiscated Property through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).  *Infra ¶* 113.

39.     Moreover, upon knowledge information and belief, Defendants Maersk and Maersk A/S regularly engage in trafficking voyages to Mariel from multiple non-U.S. ports including Shanghai, China; Ningbo (Zhejiang), China; Qingdao (Shandong), China; Xiamen (Fujian), China;

Yingkou (Liaoning), China; Hong Kong; Kaohsiung, Taiwan; Manila, Philippines; Copenhagen, Denmark; Antwerp, Belgium; Amsterdam, The Netherlands; and Bremerhaven, Germany. *Infra* ¶ 115.

## JURISDICTION AND VENUE

40.     Plaintiffs incorporate by reference Paragraphs 1 through 39 as if fully set forth herein.

41.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

42.     The amount in controversy in this action exceeds $50,000, exclusive of interest, damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b).

43.     Defendants are subject to the personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and La. Rev. Stat. Ann. § 13:3201, including subsections § 13:3201 (A)(1), (2), (3), (4), and (B) thereof, because each of them committed and continues to commit acts of trafficking as defined in the Helms-Burton Act, 22 U.S.C. § 6023(13), within the State of Louisiana and this judicial district and thus is subject to personal jurisdiction in the State courts of Louisiana and in this Court.

44.     Personal jurisdiction is conferred upon this Court over all Defendants by Federal Rule of Civil Procedure 4(k)(1)(A) and La. Rev. Stat. Ann. §13:3201(A)(1), (2), (3), (4), and (B) because the Defendants would be subject to personal jurisdiction in the State courts of Louisiana, the State in which this District Court is located.  Specifically, as alleged herein (*supra* ¶¶ 32 – 36; *infra* ¶¶ 108 - 110), Defendants are subject to the personal jurisdiction of the courts of this State and this District Court because Plaintiffs' causes of action for trafficking as defined in the Helms-

Burton Act arise from one or more of the following activities performed by Defendants in this State:

    (1)     transactions of business in this State,

    (2)     contracts to supply services in this State,

    (3)     injury or damage caused and continued to be caused by an offense or quasi offense committed through an act or omission in this State, or

    (4)     injury or damage caused and continued to be caused in this State by an offense or quasi offense committed through an act or omission outside of this State because Defendants regularly do or solicit business, or engage in any other persistent course of conduct, or derive revenue from services rendered in this State.

45.     Relatedly, personal jurisdiction over Defendants is appropriate because the Court's exercise of personal jurisdiction over Defendants is consistent with the Constitution of this State and of the Constitution of the United States.

46.     More specifically, Defendants transact business in this State because, *inter alia*, Defendants regularly use and purposefully avail themselves of the rights and privileges of using the Port of New Orleans, which is necessary to their container shipping business, including their commercial activities related to the transport of containers to, from and between the Port of New Orleans and the Port of Mariel, Cuba (*see e.g., (supra ¶¶ 32 – 36; infra ¶¶ 108 - 110)*.

47.     Defendants also contract to supply services in this State because, *inter alia*, Defendants contract to supply container shipping services and related logistics and inland transport of containers to, from and within this State, including to, from and between the Port of New Orleans and the Port of Mariel, Cuba.

48.     Defendants also caused and continue to cause injury or damage by trafficking in the Confiscated Property, including by directing vessels they operate or control to commence trafficking voyages from the Port of New Orleans destined directly for the Port of Mariel, where Defendants trafficked in the Confiscated Property to which Plaintiffs own claims and omitting to obtain the authorization from Plaintiffs, all of whom are U.S. nationals, before leaving this State for direct trafficking voyages to the Port of Mariel, Cuba.

49.     Defendants also caused and continue to cause injury or damage in this State by trafficking in the Confiscated Property to which Plaintiffs own claims at the Port of Mariel and omitting to obtain the authorization from Plaintiffs, all of whom are U.S. nationals, before leaving this State for direct trafficking voyages to the Port of Mariel, even though Defendants regularly do or solicit business in this State and/or engage in other persistent commercial activities and derive revenue from services rendered in this State.

50.     Alternatively, this Court has personal jurisdiction over Defendants Maersk and Maersk A/S pursuant to Federal Rule of Civil Procedure 4(k)(2) because the claims in this action arise under federal law, Defendants Maersk and Maersk A/S are not subject to jurisdiction in any state's courts of general jurisdiction and exercising jurisdiction over Defendants Maersk and Maersk A/S is consistent with the U.S. Constitution and laws.

51.     Exercise of personal jurisdiction by this Court over Defendants Maersk and Maersk A/S pursuant to Federal Rule of Civil Procedure 4(k)(2) is consistent with the U.S. Constitution and U.S. laws because said defendants have systematic and continuous contacts with Louisiana and the United States, they have purposefully availed themselves of the benefits and protections of Louisiana and the United States, and this action arises from or relates to such contacts and purposeful availment.

52.     In addition, in the alternative to personal jurisdiction alleged above, to the extent that Defendants Maersk and Maersk A/S are not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over Defendants Maersk and Maersk A/S by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claims arise under federal law; Defendants are not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over Defendants Maersk and Maersk A/S for their conduct purposefully directed at the United States is consistent with the U.S. Constitution and laws.  The exercise of personal jurisdiction by this Court over Defendants Maersk and Maersk A/S is consistent with the U.S. Constitution and U.S. laws because Defendants Maersk and Maersk A/S committed intentional torts purposefully directed at U.S. nationals in the United States which caused harm that Defendants Maersk and Maersk A/S knew or reasonably should have anticipated would be suffered in the United States by certain U.S. nationals.

53.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  *See supra* ¶¶ 32 – 36; *infra* ¶¶ 108 – 110 (the ship A/S PETRA (IMO # 9283708), while being operated by Defendant Maersk A/S, departed from the Port of New Orleans and sailed directly to the Port of Mariel where it trafficked in the Confiscated Property, the claims to which are owned by Plaintiffs).

54.     Contemporaneous with this filing, Plaintiffs have paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,800 pursuant to the fee schedule adopted by the Judicial Conference in September 2018, and pursuant to the fee schedule established by this District.

## THE HELMS-BURTON ACT

### I.    Background

55.    Plaintiffs incorporate by reference Paragraphs 1 through 54 as if fully set forth herein.

56.    The Helms-Burton Act, signed into law on March 12, 1996, had several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6).

57.    Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

58.    Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national (including property confiscated from a person who became a U.S. national before March 12, 1996) by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

59.     The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

60.     Although President Clinton suspended the private right of action under Title III on July 16, 1996 for six months, the August 1, 1996 effective date was never suspended. Title III of the Act came into effect on August 1, 1996.  Starting on that date, traffickers in confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

61.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

62.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, upon the expiration of the last suspension, the right to bring an action under Title III was activated.

**II.     The Helms-Burton Act's Private Right of Action**

63.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period  beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

64.    The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

65.    The Act defines "United States national" to include "any United States citizen[.]" 22 U.S.C. § 6023(15).

66.    A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)    sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii)   engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii)  causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

67.    The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

68.    The Act defines "confiscated" in relevant part as:

[T]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —

      (i)      without the property having been returned or adequate and effective compensation provided; or

      (ii)     without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

69.     The Act defines "confiscated" in relevant part as "the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 — (i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure." 22 U.S.C. § 6023(4)(A).

70.     The term "knowingly" under the Act means "with knowledge or having reason to know." 22 U.S.C. § 6023(9).

71.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

72.     Since August 1, 1996, when Title III of the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property.

73.     Companies doing business in and/or with Cuba have therefore been on notice since August 1, 1996 that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

### III.     Remedies Under the Helms-Burton Act's Private Right of Action

74.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                    …
(II) the amount determined [by a court-appointed special master], plus interest; or

(III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

75.     Interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought." 22 U.S.C. § 6082(a)(1)(B). Interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

76.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees. *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

77.     The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)  a person against whom the action is to be initiated, or

(ii)  a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)(i)").

## FACTUAL ALLEGATIONS

78. Plaintiffs incorporate by reference Paragraphs 1 through 77 as if fully set forth herein.

### I. The Confiscated Property

79. Plaintiffs are U.S. nationals and/or representatives of the Estates of U.S. nationals as defined by 22 U.S.C. § 6023(15)(A), who own claims to the Confiscated Property, which includes a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay.

### A. Maritima Mariel SA and the 70-Year Concession

80. Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case: Odette Blanco Rosell; the Estate of Alfredo Blanco Rosell, Jr; the Estate of Byron Blanco Rosell; the Estate of Enrique Blanco Rosell; and the Estate of Florentino Blanco Rosell.

81. On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year Concession:

'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and

works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English translation).

82.     The 70-Year Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay of Mariel, including:

a)  The occupation and use, either temporary or permanent, of the lands and waters in the public domain or under private ownership and those of the State, province, or municipality, whenever they are essential for the execution and exploitation of the aforementioned projects and works.

b)  The right of mandatory expropriation, in accordance with Decree No. 595 of May 22, 1907 or any other later provision regarding ownership, possession, or use of any real estate or private property rights for land that must be occupied for the work, uses, and services mentioned in Section One, a procedure that may also be used with regard to any rights granted by the State, province, or municipality with regard to the maritime-land zone or public domain land or property of those entities of the Nation.

c)  The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage, and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d)  The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e)  The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998 of January 27, 1955, whereby the National Finance Agency of Cuba will provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

83.     Both Maritima Mariel and the 70-Year Concession are part of the Confiscated Property and were specifically identified in Resolution 436 as being confiscated from the Blanco Rosell Siblings by the Cuban Government.

### B.     Central San Ramón, Compañia Azucarera Mariel S.A., and Land

84.     In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings owned several other companies, including the sugar mill then known as the Central San Ramón, which they purchased in 1949.  Central San Ramón was owned and operated by Compañia Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell Siblings.

85.     The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000 acres) southeast, south and west of Mariel Bay which they owned through Central San Ramón and Azucarera Mariel.  Those approximately 11,000 acres included numerous improvements such as roads, railways, buildings, and utilities.

86.     Azucarera Mariel, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically named and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

### II.     Cuba's Confiscation Of The Confiscated Property

87.     On September 29, 1960, per Resolution 436, the Cuban Government announced the confiscation without compensation of all assets and rights, whatever their nature, then owned by the Blanco Rosell Siblings and which are herein defined as the Confiscated Property.  Such Confiscated Property includes, *inter alia*, Maritima Mariel, the 70-year Concession, Central San Ramón, Azucarera Mariel, as well as all the "all shares or stock certificates representing capital of

the entities listed in the [other] Whereas of [Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by these entities. *See* Resolution 436 at 23406.

88. More specifically, on September 29, 1960, the Cuban Government published Resolution 436 in its Official Gazette on the confiscation without compensation of the following:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

> Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

> Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

> Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436(1) published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation).

89. In addition to expressly naming the 70-Year Concession and the above-referenced legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of, *inter alia*, the 70-Year Concession, Maritima Mariel, Central San Ramon, and Compania Azucarera Mariel.

90. But for Cuba's confiscation in Resolution 436 published in the official Cuban Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955 would still be in force. In any event, the 70-year Concession was cut short by Cuba's confiscation of the 70-year Concession.

91.     According to the Cuban Official Gazette as published on September 29, 1960, the confiscation of the Confiscated Property occurred on August 19, 1960. The story of the confiscation by the Cuban Government was reported by the Revolucion newspaper on September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolucion (now known as Granma following the merger of the Revolucion and Hoy newspapers) are available to the public.

92.     The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

> The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[4]

93.     The Confiscated Property has never been returned nor has adequate and effective compensation ever been provided, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

94.     Plaintiffs never abandoned their interest in and claims to the Confiscated Property.

---

[4]   https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited February 17, 2021).

**II.    The Cuban Government Incorporated The Confiscated Property Into
         The Zona Especial De Desarollo Mariel ("ZEDM")
         (a/k/a Mariel Special Economic Zone)**

95.    The Zona Especial de Desarrollo Mariel ("ZEDM") (*a/k/a* Mariel Special Economic
Zone) is an agency or instrumentality of the Cuban Government.   Created by statute, the ZEDM
is a special economic zone in Cuba with its own legal structure.

96.    As stated above, the ZEDM has been referred to in the media as "the star Cuban
project to attract investment." *See supra ¶ 92.*

97.    Cuba incorporated the Confiscated Property into the ZEDM without the
authorization of Plaintiffs and therefore the ZEDM traffics in the Confiscated Property.

98.    Starting in or around 2009, the Government of Cuba and various non-Cuban
corporate partners rebuilt the Port of Mariel and constructed a container terminal in the ZEDM.

99.    The ZEDM's container terminal subsumes the 70-Year Concession rights, pursuant
to which they possessed the right, among other things, "to plan, study, execute, maintain, and
exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the
construction of new buildings and works…" *See* Decree 2367 at 13865.

100.    The Blanco Rosell Siblings' extensive land holdings on the southeast, south and
west sides of Mariel Bay, all of which are part of the Confiscated Property, cover virtually every
square meter of ZEDM section A5, which the ZEDM operates as a logistics zone.

101.    The 70-Year Concession encompasses all of Mariel Bay, including, but not limited
to, ZEDM section A7, where the ZEDM's container terminal is located.   The following map
illustrates that ZEDM section A7 encompasses the shoreline of Mariel Bay and land adjacent to
the shoreline, areas that are subject to the 70-Year Concession:



102.   The ZEDM is trafficking in the Blanco Rosell Siblings' Confiscated Property within the meaning of Title III because the ZEDM:

(i)      … transfers, distributes, dispenses, brokers, manages, or … leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in [the Confiscated Property];

(ii)     engages in a commercial activity using or otherwise benefitting from [the Confiscated Property],

(iii)    causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S. Code § 6023(13)(A).

103.   Those who "plan, study, execute, maintain and exploit public docks and warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and

works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including the 70-Year Concession.

### IV.    Defendants' Trafficking

104.    Since at least 2018, Defendants have trafficked in the Confiscated Property, by knowingly and intentionally directing the container ships from the Port of New Orleans to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.  When at the Port of Mariel, the ships call at and/or otherwise use, benefit, and profit from the container terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendants also engage in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

105.    Since at least 2016, Defendants Maersk and Maersk A/S have also trafficked in the Confiscated Property, by knowingly and intentionally directing container ships from non-U.S. ports to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.  When at the Port of Mariel, the ships call at and/or otherwise use, benefit, and profit from the container terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendants Maersk and Maersk A/S also engage in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

106.    Defendant Maersk touts its service to Cuba, and specifically to the Port of Mariel, on its website:

> We connect businesses in Cuba with key markets across the globe.
>
> Whether you are shipping standard, refrigerated or oversized cargo, we have the local expertise and global network needed to get it to its destination – wherever in the world that happens to be. **We offer weekly connections from Mariel to our**

**transshipment hub in Manzanillo, Panama. From here, the rest of the world is just a short hop away.**

https://www.maersk.com/local-information/latin-america/cuba (emphasis added) (last visited February 17, 2021).

107.    On another page of Defendant Maersk's website, under the caption "Maersk's Cuban delight," Defendant Maersk further touts its success in shipping to Cuba, even while acknowledging that "international politics continue to impact the flow of trade … [.]"

> In just a few years, Maersk has managed to secure volumes north of 23,000 FFE to Cuba. Key to the success is a direct route from Europe, a high service level and a commitment to the business ambitions of the Caribbean island, where international politics continue to impact the flow of trade.

> \* \* \*

> **In 2016, Maersk's operation in Cuba broke all records, seeing its vessels carry 23,094 FFE to the ports in Mariel and Santiago.** Volumes came from Asia primarily but also, increasingly, from Europe via a direct service which was launched the same year.

> …We are the only global carrier that has a direct service to Cuba. It is an important asset to us and **our strategic commitment to be Cuba's partner in shipping and logistics, enabling them to propel their business needs and ambitions.** Basically, we identified the potential and promised the government of Cuba to put in a service if they would give us the volumes…

https://www.maersk.com/news/articles/2018/06/29/maersk-lines-cuban-delight (emphasis added) (last visited February 17, 2021).

108.    In addition to Defendant Maersk's "direct route from Europe" to Cuba, Defendant Maersk and the other Defendants have provided and/or facilitated a direct route to the Port of Mariel via the Port of New Orleans.  According to the IMO, the A/S PETRA, operated by Defendant Maersk A/S, sailed from the Port of New Orleans and called at the Port of Mariel on January 20, 2020, January 31, 2020, May 20, 2020, and August 12, 2020 and engaged in commercial activities with the Port of Mariel and the ZEDM.

109.    The A/S PETRA was knowingly and intentionally directed by Defendants to the Port of Mariel, where the A/S PETRA for itself and on behalf of and/or at the direction of Defendants, engaged in commercial activities using or otherwise benefiting from the Confiscated Property, the claims to which are owned by Plaintiffs and without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

110.    In addition, while at the Port of Mariel, the A/S PETRA engaged in commercial activities at least four times in 2020, whereby each of the Defendants for themselves and/or the other Defendants, caused, directed, participated in, or profited from trafficking in the Confiscated Property by another person, or otherwise engaged in trafficking in the Confiscated Property through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

111.    In addition to Defendants' aforementioned trafficking through A/S PETRA's voyages from the Port of New Orleans to the Port of Mariel, since 2016 Defendants Maersk and Maersk A/S repeatedly have trafficked in the Confiscated Property, the claims to which are owned by Plaintiffs, by voyaging to the Port of Mariel from non-U.S. ports, including, but not limited to, the following voyages, as reported by the IMO:

| IMO # | Arrival Date | Ship Name | Operator |
|-------|--------------|-----------|----------|
| 9339612 | Sep. 3, 2020 | ALGOL | Maersk A/S |
| 9339612 | Feb. 2, 2021 | ALGOL | Maersk A/S |
| 9339595 | Aug. 15, 2019 | ARTEMIS | Maersk A/S |
| 9337597 | Mar. 10, 2019 | GALANI | Maersk A/S |
| 9337597 | Dec. 16, 2018 | GALANI | Maersk A/S |
| 9337597 | Sep. 8, 2018 | GALANI | Maersk A/S |
| 9301562 | Dec. 25, 2019 | GEESKE | Maersk A/S |
| 9301562 | Dec. 22, 2019 | GEESKE | Maersk A/S |
| 9362724 | Jul. 23, 2020 | MACAO STRAIT | Maersk A/S |
| 9362724 | Apr. 18, 2020 | MACAO STRAIT | Maersk A/S |
| 9362724 | Mar. 4, 2020 | MACAO STRAIT | Maersk A/S |
| 9362724 | Feb. 1, 2020 | MACAO STRAIT | Maersk A/S |

112.    The ALGOL, ARTEMIS, GALANI, GEESKE, and MACAO STRAIT were knowingly and intentionally directed by Defendants Maersk and Maersk A/S to the Port of Mariel, for themselves and on behalf of and/or at the direction of Defendants Maersk and Maersk A/S, and engaged in commercial activities using or otherwise benefiting from the Confiscated Property, the claims to which are owned by Plaintiffs and without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

113.    In addition, while at the Port of Mariel, the ALGOL, ARTEMIS, GALANI, GEESKE, and MACAO STRAIT engaged in commercial activities, whereby each of the Defendants Maersk and Maersk A/S, caused, directed, participated in, or profited from trafficking in the Confiscated Property by another person, or otherwise engaged in trafficking in the Confiscated Property through another person without the authorization of Plaintiffs, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

114.    The aforementioned trafficking voyages of the A/S PETRA, ALGOL, ARTEMIS, GALANI, GEESKE, and MACAO STRAIT are but a few of Defendants Maersk and Maersk A/S's trafficking voyages to the Port of Mariel. *See supra* ¶ 107 (Maersk website touting that "[i]n 2016, Maersk's operation in Cuba broke all records, seeing its vessels carry 23,094 FFE to the ports in Mariel and Santiago.").

115.    As of the date of this Complaint, Maersk's online schedule showed regular scheduled service to the Port of Mariel from multiple ports in Asia and Europe, including but not limited to the following:   Shanghai, China; Ningbo (Zhejiang), China; Qingdao (Shandong), China; Xiamen (Fujian), China; Yingkou (Liaoning) (China); Hong Kong; Kaohsiung, Taiwan;

Manila, Philippines; Copenhagen, Denmark; Antwerp, Belgium; Amsterdam, The Netherlands; and Bremerhaven, Germany.[5]

116.    On September 18, 2020, Plaintiffs, through counsel, sent Defendants Maersk and Maersk A/S a letter pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letter") notifying them that they were trafficking in confiscated property as defined in Title III, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.  The Notice Letter was delivered to Maersk and Maersk A/S by FedEx on September 21, 2020.  The Notice Letter was delivered to Maersk and Maersk A/S by U.S. Postal Service Registered Mail on October 16, 2020.

117.    On September 22, 2020, Plaintiffs, through counsel, sent Defendant Maersk Inc. a letter pursuant to 22 U.S.C. § 6082(a)(3)(D) ("Notice Letter") notifying it that it was trafficking in confiscated property as defined in Title III, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.  The Notice Letter was delivered to Maersk Inc. by FedEx on September 22, 2020.   The Notice Letter was delivered to Maersk Inc. by a process server on September 28, 2020.  The Notice Letter was delivered to Maersk Inc. by U.S. Postal Service Certified Mail on September 29, 2020.

118.    Even after Defendants Maersk and Maersk A/S received Plaintiffs' Notice Letter, giving them actual notice of Plaintiffs' claims, Maersk and Maersk A/S continued to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs, including, but not limited to, for example, the February 2, 2021 trafficking voyage to Mariel that was undertaken by the ALGOL more than 30 days after Maersk and Maersk A/S received Plaintiffs' Notice Letter [by FedEx on September 21, 2020 and by U.S. Postal Service Registered Mail October 16, 2020].

---

[5] *See* https://www.maersk.com/schedules/pointToPoint (to access the schedules to Mariel (a) separately type each of  the foregoing port names into the "From (City, Country/Region)" box; (b) type "Mariel, Cuba" into the "To (City, Country/Region)" box;  and (c) click "Search.") (last visited February 17, 2021).

119.    Moreover, upon knowledge information and belief, even after Defendants Maersk and Maersk A/S received Plaintiffs' Notice Letter [by FedEx on September 21, 2020 and by U.S. Postal Service Registered Mail on October 16, 2020], Maersk and Maersk A/S have continued to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs from ports in Asia and Europe, including but not limited to:  Shanghai, China; Ningbo (Zhejiang), China; Qingdao (Shandong), China; Xiamen (Fujian), China; Yingkou (Liaoning), China; Hong Kong; Kaohsiung, Taiwan; Manila, Philippines; Copenhagen, Denmark; Antwerp, Belgium; Amsterdam, The Netherlands; and Bremerhaven, Germany.  *See supra* ¶ 115 and n. 5.

120.    By and/or through the acts of trafficking of the A/S PETRA in the Confiscated Property, which was undertaken and done without the authorization of Plaintiffs, Defendants trafficked in the Confiscated Property either directly or by causing, directing, participating in, or profiting from trafficking by or through the A/S PETRA and/or one or more of the other Defendants.

121.    By and/or through the acts of trafficking of the ALGOL, ARTEMIS, GALANI, GEESKE, MACAO STRAIT, and other vessels in the Confiscated Property, which was undertaken and done without the authorization of Plaintiffs, Defendants Maersk and Maersk A/S trafficked in the Confiscated Property either directly or by causing, directing, participating in, or profiting from trafficking by or through the ALGOL, ARTEMIS, GALANI, GEESKE, MACAO STRAIT, and other vessels and/or one another.

122.    Because Defendants did not obtain the authorization of Plaintiffs with regard to these acts of trafficking, Plaintiffs were injured by Defendants' acts of trafficking in the Confiscated Property to which Plaintiffs own claims.

123.    Plaintiffs have been injured by Defendants' unauthorized acts of trafficking in the confiscated property to which plaintiffs own claims because, *inter alia*:

(a)    Defendants are profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)    Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)    Defendants are profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)    Defendants are profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)    Defendants' trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)    Defendants have profited from their use of the Confiscated Property at Plaintiffs' expense;

(g)    Defendants have denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization to Defendants to traffic in the Confiscated Property; and

(h)    Defendants have appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property.

124.    To the extent that one or more of the Defendants may claim to have one or more licenses issued by the United States Department of the Treasury Office of Foreign Assets Control for some or all of their shipments to Cuba, any such licenses do not qualify Defendants to benefit from the lawful travel affirmative defense contained in 22 U.S.C. § 6023(13)(B)(iii).

## CLAIM FOR DAMAGES
## TITLE III OF THE HELMS-BURTON ACT

125.    Plaintiffs incorporate by reference Paragraphs 1 through 124 as if fully set forth herein.

126.    This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

127.    Defendants did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13)(A), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.  Defendants are therefore liable to Plaintiffs under the Helms-Burton Act.

128.    Defendants have trafficked in the Confiscated Property, by knowingly and intentionally directing the container ship A/S PETRA from the Port of New Orleans to the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person, including other Defendants.  When in the Port of Mariel, the A/S PETRA called at, and/or otherwise used, benefited, and profited from the container terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendants also engage in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

129.    Defendants Maersk and Maersk A/S have trafficked in the Confiscated Property, by knowingly and intentionally directing the container ships the ALGOL, ARTEMIS, GALANI, GEESKE, and MACAO STRAIT from non-U.S. ports to the Port of Mariel in Cuba, either directly

or by causing, directing, participating in, or profiting from trafficking by or through another person.  When in the Port of Mariel, the aforementioned vessels called at, and/or otherwise used, benefited, and profited from the container terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendants Maersk and Maersk A/S also engage in commercial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

130.    Defendants are therefore trafficking in Plaintiffs' Confiscated Property and benefit or profit from the trafficking of the ZEDM in Plaintiffs' Confiscated Property.

131.    Beginning on or about September 2018, Defendants also knowingly and intentionally participated in, benefitted from, and profited from the ZEDM's trafficking in the Confiscated Property including, but not limited to, the 70-Year Concession, without the authorization of Plaintiffs.

132.    Defendants engage in commercial activities using or otherwise benefitting from the Confiscated Property, including, but not limited to, the 70-Year Concession.

133.    Defendants also cause, direct, participate in, or profit from trafficking by the ZEDM in the Confiscated Property, including the 70-Year Concession.

134.    Defendants Maersk and Maersk A/S have had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least September 21, 2020, due to Plaintiffs' Notice Letter mentioned above in Paragraph 116.

135.    Defendant Maersk Inc. has had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least September 22, 2020, due to Plaintiffs' Notice Letter mentioned above in Paragraph 117.

136.    Even prior to Defendants' receipt of Plaintiffs' Notice Letters, Defendants knew or had reason to know that Plaintiffs own claims to the Confiscated Property.

137.    Prior to Defendants' receipt of Plaintiffs' Notice Letters, Defendants knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

138.    Defendants Maersk and Maersk A/S's continued trafficking in the Confiscated Property, including in the 70-Year Concession, more than 30 days after their receipt of Plaintiffs' Notice Letter, subjects Defendants Maersk and Maersk A/S to treble damages.   22 U.S.C. § 6082(a)(3).

139.    The ZEDM never sought nor obtained Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-Year Concession, the land, or any other Confiscated Property at any time.

140.    The ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking without authorization as defined in 22 U.S.C. § 6023(13).

141.    Defendants did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property, including in the 70-Year Concession or any other property interests at any time.

142.    Defendants' knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking without authorization as defined in 22 U.S.C. § 6023(13).

143.    As a result of Defendants' trafficking in the Confiscated Property, Defendants are liable to Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

    a.    The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the "fair market value" of the Confiscated Property calculated as being either the current value of the property, or the value of the property when confiscated, plus interest;

    b.    As to Defendants Maersk and Maersk A/S, three times the amount determined above (treble damages); and

c.     Court costs and reasonable attorneys' fees, and expenses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.     Awarding damages as allowed by law and pre-filing interest as provided by the Act, including treble damages against Defendants Maersk and Maersk A/S;

B.     Awarding prejudgment interest as allowed by law on any amounts awarded;

C.     Awarding attorneys' fees, costs, and expenses; and

D.     Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  February 17, 2021                Respectfully submitted,


*/s/ Jacques P. DeGruy*
Robert R. Johnston, T.A. (#22442)
Jacques P. Degruy (#29144)
Constance C. Waguespack (#36416)
**PUSATERI, JOHNSTON, GUILLOT &
GREENBAUM, LLC**
1100 Poydras St, Suite 2250
New Orleans, LA 70163
Telephone: (504) 620-2500
Facsimile: (504) 620-2510
Robert.Johnston@pjgglaw.com
Jacques.DeGruy@pjgglaw.com
Constance.Waguespack@pjgglaw.com
*Counsel for Plaintiffs*

*Of Counsel*

BERLINER CORCORAN & ROWE LLP

David A. Baron (to be admitted *pro hac vice*)
Melvin White (to be admitted *pro hac vice*)
James L. Marketos (to be admitted *pro hac vice)*
Laina C. Lopez (to be admitted *pro hac vice*)
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035
dbaron@bcr-dc.com
mwhite@bcr-dc.com
jlm@bcr-dc.com
lcl@bcr-dc.com

FIELDS PLLC

Richard W. Fields (to be admitted *pro hac vice*)
Martin Cunniff (to be admitted *pro hac vice*)
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816
fields@fieldslawpllc.com
MartinCunniff@fieldslawpllc.com